

February 1, 2013

<u>**Via Electronic Filing**</u>
The Honorable Leonard P. Stark
United States Court for the District of Delaware          **FILED UNDER SEAL**
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, Delaware 19801

Re: *Graphics Properties Holdings, Inc. v. Asus Comp. Int'l*, C.A. No. 12-cv-210-LPS

Dear Judge Stark:

    Pursuant to the Court's Order dated October 17, 2012 (D.I. 32), Plaintiff Graphic Properties Holdings, Inc. ("GPH"), files this supplemental letter-brief in opposition to Defendants' Motion to Dismiss for Lack of Jurisdiction (D.I. 11).

## I. Argument Summary

    GPH's jurisdictional discovery has established that there are two separate and independent grounds supporting personal jurisdiction over Asus Computer International, Inc. ("ACI") for its infringement of US Patent No. 5,896,119. The first ground presents a routine basis for personal jurisdiction in a patent case. The Court has specific jurisdiction over GPH's claim under section (3) of the Delaware Long Arm Statute, 10 Del. Code § 3104(c), because ACI has committed an act of direct infringement of the '119 patent in Delaware—a sale of the VH242H monitor ("242 monitor") in Delaware. ACI's contention that it has never shipped the 242 monitor into Delaware is wrong. The evidence shows that on two occasions ACI shipped a new 242 monitor to a Delaware resident to satisfy the warranty on an original monitor purchase.

    The second ground for jurisdiction arises from the operative facts associated with ACI's distribution network, set up through ACI's contracts with its "direct accounts" (companies that buy ACI monitors to sell nationwide). These facts satisfy the requirements for establishing jurisdiction under the Supreme Court's highest standard for a stream of commerce theory. In far more than a simple supplier-seller distribution network, ACI and its direct accounts implement a joint plan for the promotion, sale, and service of Asus monitors in all 50 states, with no intention to exclude Delaware.

## II. Factual Background

    ACI has set up a nationwide distribution network for the sale of its monitors to consumers with its "direct account" customers, which serve as partners in a common plan for the sale of Asus products in all 50 states. ACI's direct accounts include "bricks and mortar" big box retailers like    and    that purchase Asus monitors from ACI and then sell them to consumers in stores throughout the country (Ex. A at 24-25). Distributors, such as    add a middle-man layer between ACI and consumers whereby ACI sells the products to distributors, who, in turn, sell them to other retailers (*id.* at 33). ACI enters into contracts with its



direct accounts with the knowledge that they will cover a "nationwide" territory, such that ACI's sales partners are encouraged to sell Asus products in all 50 states (*see* Ex. B at § 1 (appointing ██████████████████████████████████), Ex. C at § 1 (granting██████████ ██████████████████████████████████)). ACI's contracts show that ACI's joint sales program goes far beyond one in which ACI simply supplies products to retailers and distributors who independently sell the products. For example, ACI and ██████ entered into several contracts structuring their partnership for the sale of Asus products (Exs. B, D, E, F, G). The contracts show ACI's cooperation to train its direct account partners regarding Asus products, to market and advertise Asus products, and to service Asus products throughout the country via ACI's warranty program (*id.*).

ACI provides a warranty in the box to consumers who purchase its monitors, including the 242 monitor (Ex. H at ASUS_GPH0640). ACI and its authorized retailers such as██████ agree that consumers can go to the retailers or to ACI for service under the warranty program (*see* Ex. A at 86-87; *compare* Ex.H at ASUS_GPH0640 *with* Ex. D at § 1.1). The warranty specifically states that under certain circumstances ACI agrees to provide a new monitor to consumers in replacement of their original monitor (*see* Ex. H at ASUS_GPH0640 (offering "repair … or replacement with a factory reconditioned unit" upon return of "defective LCD monitor with its base"), Ex. A at 108 ████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████). When ACI supplies a new monitor to a consumer, it receives the implicit agreement from the consumer that it has satisfied the warranty, as well as the original product, which it can use for a variety of purposes including replacement parts, in consideration for ACI's supplying that replacement monitor directly to the consumer under the warranty program.

Documents produced by ACI show that in ████ separate cases Delaware residents engaged ACI directly for service under the warranty program (*see* Ex. I (summarizing cases), Ex. A at 110-17 (authenticating summary), Ex. J (providing detailed records), Ex. A at 118 (authenticating records)). In ████ such cases, ACI supplied replacement 242 monitors directly to residents in Delaware pursuant to the warranty program, and ACI admitted that for ████ of those cases the shipment of the monitor to the resident in Delaware closed the case and satisfied ACI's obligations under the warranty (*see* Ex. A at 120 (████████████████████████████████████ ███████████████████████████████████████████████████████████████████████)).

In addition to the warranty program, ACI contractually agrees to provide training to its direct accounts to assist in their sales and servicing of Asus products (*see, e.g.*, Ex. G at § 14.2 (█████████████████████████████████████████)). ACI also contracts with its direct accounts to provide marketing and sales support (*see, e.g.*, Ex. G at § 12.2 (concerning promotional material ACI provides). Ex. K at §§ 3.2(a), 3.3, 6.1-6.5 (concerning promotional material, funding of█████████, and marketing allowance██████). ACI supplies marketing and technical information to its direct accounts to assist them to sell Asus products to their customers (*see, e.g.*, Ex. G at §§ 12.1, 12.2, Ex. K at §§ 3.2(a), 3.3, 5.1). ACI provides additional marketing of its products through its own website (Ex. A at 110-17). Additionally, ACI provides its customers with a manufacturer's suggested retail price for its monitors (*id.* at 54). ACI offers rebates on its website to consumers to entice them to purchase

242 monitors from ACI's direct accounts (*see, e.g.*, Ex. L, Ex. A at 95-96). Further, ACI works closely with its direct accounts to set up a defective returns program where ACI's customers can return defective merchandise to ACI for credit (*see, e.g.*, Ex. D at §§ 3(b)-(n)). Finally, ACI's indemnification of its direct accounts for patent infringement by its products shows the strong relationship between them (*see, e.g., id.* at § 8(a), Ex. K at § 8.1(a)).

## III. Argument

### A. There Is Specific Jurisdiction Over GPH's Claim For Infringement Of The '119 Patent Because ACI Sold The Accused 242 Monitors Directly To Delaware Residents

It is routine in patent cases in Delaware for the Court to find specific personal jurisdiction under subsection (3) of the Delaware Long Arm Statute, 10 Del. Code § 3104(c), based upon sales of accused products in Delaware. (*See, e.g., TriStrata Tech., Inc. v. Emulgen Labs, Inc.*, 537 F. Supp. 2d 635, 640 ("where the claim is one for tortious injury under subsection (c)(3), a single 'act or omission' in the State in which the injury was caused will suffice") (citing *LaNuova D & B, S.p.A v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986)). Now that GPH has taken jurisdictional discovery from ACI, it is clear that this is such a case.

In support of its motion, ACI offered the declaration of Godwin Yan, who averred to purported facts regarding ACI's sales of Asus products in Delaware. With respect to the 242 monitor, Mr. Yan swore that "[ACI] has not sold or shipped to customers in Delaware any of the [242 monitors] . . . for at least the past six years (2006 to 2011)." (D.I. 16 at 11). It turns out that statement was wrong. Regardless as to whether it occurred to him or not, ACI did ship 242 monitors to customers in Delaware on multiple occasions pursuant to the warranty program. During his deposition, Mr. Yan, who was ACI's corporate representative for the jurisdictional discovery, described ACI's process for recording information for each "case" in which an ACI customer engaged ACI for servicing of a 242 monitor acquired from one of ACI's direct accounts. ACI admitted that there were ███ cases where residents of Delaware returned their original 242 monitors to ACI under the warranty (*see* Ex. A at 114-17 (walking through ██ cases)). ACI further admitted that in the case of Delaware resident ████████████, from ██████████, ACI shipped a different 242 monitor to Mr. ████████ in 2009. ACI admitted that it received consideration for providing that new 242 monitor to Mr. ███████ in the form of satisfaction of the warranty service agreement (*see id.* at 120). And ACI kept the original 242 monitor as further consideration for supplying Mr. ████████ with that new 242 monitor. The service records for the case of Delaware resident ███████████ purchaser of the 242 monitor with serial number ████████████41, indicate that ACI likewise provided a new 242 monitor with serial number ██████████76 to Mr. ███████ to satisfy the warranty service agreement for the original monitor (*see* Ex. I at lines 2-5 (summarizing Mr. ████████ multiple returns of monitor ██████████41 and subsequent service on replacement monitor ███████████76), Ex. J at ASUS_GPH1535-69 (detailing ACI's three attempts from January through July of 2010 to fix Mr. ████████ monitor s.n. ██████████41 and ACI's replacement of it with monitor s.n. ██████████76)).

It is indisputable that each of these two instances where ACI provided a 242 monitor directly to a Delaware resident in exchange for satisfaction of the warranty service agreement

and the receipt of the original 242 monitor, which ACI could use for a variety of purposes, qualifies as a sale in Delaware of an alleged infringing product under Section 271(a) of the Patent Act. The patent laws are clear that the place of "sale" is where a customer receives an infringing product. (*See North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) ("to sell an infringing article to a buyer in [a state] is to commit a tort there (though not necessarily only there)")). Also, consideration for the sale of patented products can take a variety of forms beyond monetary payment, and the benefits to ACI associated with satisfaction of the warranty and receipt of another product undeniably amount to consideration evidencing a "sale" of patented goods. (*See, e.g., In re Kollar*, 286 F.3d 1236, 1331 n.3 (Fed. Cir. 2002) (noting purported lease or licensing entitling possession and use of invention tantamount to sale); *see also B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 1994 WL 16019986, at *5-*6 (D. Del. Nov. 10, 1994) (noting delivery of infringing item is hallmark of sale)). The factual circumstances here go well beyond those at issue in a "repair vs. reconstruction" case where claims for patent infringement are found to be proper where a purchaser of a product goes beyond reconditioning a product worn by use and instead makes a whole new article. (*See, e.g., Kendall Co. v. Progressive Med. Tech., Inc.*, 85 F.3d 1570, 1574 (Fed. Cir. 1996), *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 343 (1961)). Here, the case for patent infringement is even more compelling and straightforward because ACI itself supplied a whole new product to the customer in exchange for satisfaction of the warranty agreement.

Accordingly, under 10 Del. Code § 3104(c)(3), this Court has specific jurisdiction over GPH's claim for infringement of the '119 patent by ACI in the Amended Complaint.

B. Considering The Supreme Court's Highest Standard For A Stream Of Commerce Analysis, ACI's Joint Sales Plan With Its Direct Accounts Is Sufficient To Establish Personal Jurisdiction

In *Beverly Hills Fan Co. v. Royal Sovereign Corp*, the Federal Circuit held that when a manufacturer purposefully ships infringing products through an established distribution channel with the expectation that those infringing products will be sold in a forum, the patentee's infringement action arises out of the manufacturer's activities. (21 F.3d 1558, 1568 (Fed. Cir. 1994); *see also Schwanger v. Munchkin, Inc.*, 217 F.3d 854, 1999 WL 820449, at *6 (Fed. Cir. Oct. 7, 1999) ("the allegations here are that Munchkin purposefully shipped the accused product into Ohio through Wal-Mart, an established distribution channel. The cause of action for patent infringement is alleged to arise out of these activities. No more is required to establish the purposeful minimum contacts necessary for personal jurisdiction.")).

The Court in *Beverly Hills Fan* applied what is considered to be the more exacting requirement for establishing jurisdiction under a stream of commerce theory of jurisdiction enunciated by Justice O'Connor in *Asahi Metal*, (*Beverly Hills Fan*, 21 F.3d at 1566). The facts here showing "additional conduct" beyond simply placing products into the stream of commerce, and indicating "an intent or purpose to serve the market in the forum State," are far more compelling than those in *Beverly Hills Fan*. In *Beverly Hills Fan*, the facts showed that the defendant had never directly shipped the accused fan into Virginia (*id.* at 1560), had only once made a shipment of unrelated goods into the state (*id.* at 1561), and the accused product was only available from a single chain of stores in Virginia (*id.* at 1564). Here, the facts show

significantly more intent on the part of ACI to reach customers through its close partnership with the multiple distributors in its distribution network serving Delaware for the sale of the 242 monitor. As described in Section II, *supra*, ACI has arranged with multiple distributors to serve the Delaware market through "nationwide" contracts (*see, e.g.*, Ex. B at § 1, Ex. C at § 1, Ex. K at § 1.1, and has itself directly shipped into Delaware infringing 242 monitors to the end-customers of its nationwide direct accounts as part of the integrated service and warranty program for Delaware end-users that ACI runs with its nationwide direct accounts (*see, e.g.*, Ex. I (listing █ such shipments); *see also* Ex. A at 86-87, Ex. G at § 7.5, Ex. D). ACI also provides to its direct accounts and distributors serving Delaware training (*see, e.g.*, Ex. G at § 14.2), cash marketing assistance (*see, e.g.*, Ex. K at § 6.1), Asus-branded marketing materials including the use of its trademarks (*see, e.g.*, Ex. G at §§ 12.1, 12.2, 14.1), and direct advertisement of the Delaware resellers of its infringing monitors through the "Where To Buy" link on its website (*see* Ex. A at 38).

These operative facts are more than sufficient to satisfy the standard for dual jurisdiction in Delaware, as set forth in *Power Integrations, Inc. v. BCD Semi. Corp.* (547 F. Supp. 2d 365, 369 (D. Del. 2008)). To the extent ACI contends that the Court's dual jurisdiction theory for a stream of commerce analysis is questionable after the Supreme Court's ruling in *Nicastro*, that is not an issue here because GPH has shown that the facts support jurisdiction under the highest standard considered by the Supreme Court and fully accord with the Federal Circuit's analysis in *Beverly Hills Fan*, which controls the due process analysis for personal jurisdiction in patent cases. (*See Prototype Prods., Inc. v. Reset, Inc.*, 844 F. Supp. 2d 691, 700-01 (E.D. Va. 2012)).

Moreover, in *Belden Techs., Inc. v. LS Corp.*, this Court considered a stream of commerce analysis on facts including a single contract with a single distributor that did <u>not</u> include Delaware in its territory (829 F. Supp. 2d 260, 264 (D. Del. 2010)), four sales by the single (unauthorized) distributor of infringing cables into Delaware (*id.* at 265), no allegation that warranty services were ever performed on products sold into Delaware (*id.* at 266), and no allegation of training or marketing assistance for distributors authorized to sell into Delaware. This Court described the facts as "at best evenly weighed" after determining that "it [was] not clear from the sales agreement that [the distributor] 'agreed to serve as the sales agent in the forum state' as contemplated by Justice O'Connor[,]" and declined to exercise personal jurisdiction. *Id.* at 270. But in the instant case, ACI has multiple authorized distributors with territories including Delaware (*see* Ex. B at § 1 (appointing ████████████████ ██████████████████), has itself directly shipped infringing 242 monitors into Delaware as part of the warranty program it runs with its Delaware-authorized distributors, such as ██████ (*see, e.g.*, Ex. I (listing █ such shipments)), and provides active marketing assistance and customer referrals through its website to Delaware-authorized distributors (*see* Ex. A at 38 (describing link)). ACI's facts are distinguishable from those in *Belden Techs.* and show ACI's intent and purpose to jointly serve the Delaware market through its multiple partnerships with distributors for sales, marketing, customer referrals, training, and service.

Accordingly, under the most stringent standard for a stream of commerce analysis, this Court has dual jurisdiction over GPH's claim for infringement of the '119 patent by ACI in the Amended Complaint.

Respectfully submitted,

/s/ Brian E. Farnan

Brian E. Farnan

cc: Counsel of Record (via E-Filing)